**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DAVID W.**

                              **Plaintiff,**

**v.**                                                      **8:20-CV-0201 (NAM)**

**ANDREW M. SAUL,**
**Commissioner of Social Security,[1]**

                              **Defendant.**
_____

**Appearances:**

David W.
_Plaintiff Pro Se_

Paul Nitze
Social Security Administration
Office of the General Counsel
J.F.K. Federal Building, Room 625
Boston, MA 02203
_Attorney for Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

### I.    INTRODUCTION

      Plaintiff David W. filed this action on February 24, 2020 under 42 U.S.C. § 405(g),

challenging the denial of his application for social security disability ("SSD") benefits under the

Social Security Act.  (Dkt. No. 1).  After carefully reviewing the administrative record, ("R,"

Dkt. No. 10), the Court affirms the decision of the Commissioner.

---

[1] Plaintiff commenced this action against the "Commissioner of Social Security." (Dkt. No. 1).  Andrew M. Saul became the Commissioner on June 17, 2019 and will be substituted as the named defendant in this action.  Fed. R. Civ. P. 25(d).  The Clerk of Court is respectfully directed to amend the caption.

## II.    BACKGROUND

Plaintiff applied for disability insurance benefits in February 2016, alleging that he has been disabled since September 1, 2011.  (R. 10).  Plaintiff claims he is disabled due to Tourette's syndrome, generalized anxiety disorder, secondary dystonia, depression, chronic pain in the neck and back, spells and seizures, neuropathy in the left hand and foot, numbness in the left hand and foot, movement disorder, nausea, occasional vomiting, shooting pain down the left arm, and panic attacks.  (R. 203).

The Social Security Administration ("SSA") denied Plaintiff's claim on June 8, 2016. (R. 10).  Plaintiff appealed the decision and requested a hearing before an Administrative Law Judge ("ALJ") on July 28, 2016.  (*Id*.).  A hearing was held on February 16, 2018 before ALJ Andrew J. Stoles, Jr.  (R. 29–48).  The hearing was postponed to allow Plaintiff to obtain counsel.  (R. 39).  On October 25, 2018, Plaintiff appeared with counsel at a second hearing.  (R. 49–84).  On November 7, 2018, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 10–21).  Plaintiff's subsequent request for review by the Appeals Council was denied on December 20, 2019.  (R. 1–3).  Plaintiff then commenced this action.  (Dkt. No. 1).

### A.  Plaintiff's Background and Testimony

Plaintiff was born in 1966.  (R. 173).  He completed two years of college and worked as a production manager for a cable company from 1994 to 2000.  (R. 203).  Plaintiff continued working in video production from 2000 to 2011.  (*Id*.).  Plaintiff claims that he stopped working because of his medical conditions.  (R. 62).  He testified that he has not worked since 2011, except for several brief attempts to do small videography projects in 2014.  (R. 56).

Plaintiff testified that he probably has had Tourette's syndrome since he was a teenager, and that his symptoms can take various forms, including "tics" like rapid jerking and twisting

2

movements of the head and neck which cause pain.  (R. 63, 211).  He testified that his condition has worsened over the years with more pain, and that it "has a lot of comorbid conditions," including anxiety, depression, and obsessive-compulsive disorder, which all "feed on each other in [his] case."  (R. 63).

Plaintiff lives with his wife and two children.  (R. 215).  He testified that he helps with some chores and goes to the grocery store.  (R. 68).  Plaintiff has a driver's license and drives "almost daily," including dropping his children off at school and picking them up, a trip which usually takes ten minutes.  (R. 57).  He sometimes has difficulty driving for longer periods of time, depending on his condition.  (R. 58).  He can care for his personal hygiene, does several exercise routines, and attends his daughter's soccer games.  (R. 69–70).

Plaintiff testified that on a daily basis his anxiety and Tourette's syndrome are "very draining" and affect his socialization.  (R. 71).  He said that his conditions also affect his concentration and focus because he is easily distracted and "keeping on task with anything is very difficult."  (R. 72).  Plaintiff testified that he could sit for a few hours at most, but then pain would radiate throughout his back and neck.  (R. 66).  He also said that he could stand and walk carefully.  (*Id.*).  Plaintiff stated that he has difficulty lifting, and that when he is just moving, it feels like "two bones [are] rubbing together in [his] neck."  (R. 65).  Plaintiff has used various medications to treat his conditions, including Zoloft to treat anxiety, Ativan to improve his sleep, and Motrin to help relieve neck pain.  (R. 64–65).

### B.  Medical Evidence

Plaintiff was first diagnosed with Tourette's syndrome in 1998 by Dr. Eric Molho at the Albany Medical Center Parkinson's Disease and Movement Disorder Clinic.  (*See* R. 167, 221).

3

Over the years, Plaintiff has received treatment for Tourette's syndrome and other conditions from several providers.

### 1.  In Health Family Medicine

On June 26, 2013, Plaintiff saw Anita Bodrogi, D.O., reporting shortness of breath with exercise.  (R. 284–85).  Plaintiff was diagnosed with asthma, arthritis, and gastroesophageal reflux.  (R. 285).  On May 19, 2014, Plaintiff reported weight loss.  (R. 280–81).  Plaintiff said that his energy level "feel[s] alright," but that his sleep is poor, and he can be very tired in the afternoon.  (*Id.*).  Plaintiff also reported that he was taking "a lot of Motrin for neck and back pain", and his other medications included omeprazole.  (*Id.*).  Dr. Bodrogi ordered bloodwork and referred Plaintiff to a gastroenterologist.  (R. 281).

On September 29, 2015, Plaintiff saw Glenn Lyons, PA, for his annual physical exam. (R. 273–74).  He reported that his "temporal lobe" seizures were becoming more frequent.  (R. 273).  He denied symptoms of blurred vision, head trauma, headaches, tremors, visual changes, hearing loss, chest pains, abdominal pains, joint pain, and memory loss or confusion.  (R. 273– 74).  His physical exam was generally normal across the board.  (R. 274).  PA Lyons recommended Plaintiff receive a neurology consultation.  (R. 274).

On April 19, 2016, PA Lyons diagnosed Plaintiff with Tourette's and cervicalgia.  (R. 348).  In a radiology report from April 2016, Dr. Edward Larow, M.D., found evidence of mild degenerative disease.  (R. 347).  An MRI scan of Plaintiff's cervical spine was performed in May 2016, with findings of "normal signal intensity and contour."  (R. 345–46).

### 2.  Champlain Valley Physician's Hospital Medical Center

On May 30, 2014, Dr. Curt Snyder, M.D., examined Plaintiff and performed a CT scan of his chest.  (R. 267).  Dr. Snyder observed a "tiny nodule adjacent to the right major fissure,"

and recommended a follow up study in six months. (*Id.*). On July 8, 2014, Dr. Faranak

Tafazoli, M.D., completed a CT exam of Plaintiff's abdomen and pelvis to assess his "abnormal

weight loss." (R. 269). The CT revealed "moderately severe degenerative disc space narrowing

at L5-S1," but Dr. Tafazoli concluded that there were "no significant CT findings to explain

patient's symptoms." (R. 270).

### 3.  University of Vermont Medical Center

From 2010 through 2015, Plaintiff saw Dr. James T. Boyd, M.D. (R. 305–38). On

November 9, 2010, Plaintiff's diagnoses were listed as Tourette's syndrome and generalized

anxiety disorder. (R. 307). Plaintiff reported taking guanfacine, aspirin, multivitamins, and

clonazepam. (R. 308).

On December 9, 2010, Plaintiff saw Dr. Boyd for a follow up examination of his

Tourette's syndrome and anxiety. (R. 309). Dr. Boyd reported that the guanfacine 2 mg dose

had caused Plaintiff to have some blurring of vision, but that he had felt "a very good response

with a reduction of anxiety and severity of tics." (*Id.*). Dr. Boyd reported a continuation of

Plaintiff's head and facial movements, and muscular pain during Plaintiff's more prominent tics.

(*Id.*). Dr. Boyd noted that the tics "wax and wane," and that a worsening of Plaintiff's anxiety is

associated with an increase in tic frequency and severity. (*Id.*). Plaintiff reported that infrequent

doses of clonazepam were successfully used for the anxiety and tics. (*Id.*). Dr. Boyd noted that

Plaintiff was "alert and attentive" during the thirty-minute visit, and that Plaintiff described his

mood as "good." (*Id.*). Plaintiff and Dr. Boyd discussed a care plan and determined that

Plaintiff should transition to a different guanfacine tablet, continue on clonazepam as needed,

and take baclofen for muscular pain. (*Id.*).

On April 26, 2011, Plaintiff returned to Dr. Boyd; Plaintiff had stopped taking guanfacine, despite the relative reduction in tics, because it caused "slowed cognition." (R. 314). Plaintiff continued to use clonazepam. (*Id*.). Dr. Boyd noted that Plaintiff's moderately severe involuntary facial movements persisted, and that the most bothersome of these was the dystonic tic of the neck which produced torticollis and neck pain. (*Id*.). Dr. Boyd discussed treatment options with Plaintiff, including botulinum toxin injections. (*Id*.).

On October 25, 2011, Plaintiff reported sleep disruption due to neck pain and nocturia. (R. 319). Dr. Boyd noted "prominent hypertrophy of the right sternocleidomastoid with intermittent activation causing right head tilt and left head turn," which were "partially suppressible for brief periods of time." (*Id*.). Dr. Boyd also reported "tenderness to palpitation in the left trapezius and splenius capitis." (*Id*.). Plaintiff discussed treatment options with Dr. Boyd and elected to retry citalopram. (*Id*.).

On May 1, 2012, Plaintiff saw Dr. Boyd and reported that he had stopped taking citalopram because he felt "foggy and disconnected." (R. 323). Plaintiff's tics remained stable and suppressible, and Dr. Boyd stated that Plaintiff was responsive to pain relief with Ibuprofen. (*Id*.). Plaintiff was unable to obtain insurance approval for the botulinum toxin injections for his dystonic tics, but he reported occasionally self-medicating his anxiety and tics with marijuana. (*Id*.). Intermittent use of baclofen was successful and improved sleep. (*Id*.). Dr. Boyd stated that on examination, Plaintiff was "alert… pleasant, and cooperative," and reported "intact judgement and appropriate insight." (R. 324). Dr. Boyd's assessment noted "anxiety with comorbid attentional problems." (*Id*.).

On October 30, 2015, Plaintiff saw Dr. Danilo Vitorovic for "weird sensations" that Plaintiff thought may have been temporal lobe seizures. (R. 325–29). Plaintiff reported having

"spells" for the last 15 to 20 years, but in the last 2 years, the spells had become more frequent. (R. 326). These "spells" would start with a sudden sensation, followed by "bizarre visual flashbacks, flashing of light, and heavy breathing, without loss of awareness." (*Id.*). Plaintiff also reported an "almost constant low grade headache" and complained of memory problems. (*Id.*).

A neurological examination found that Plaintiff's "orientation, memory, attention, language and fund of knowledge were normal," and his "strength was 5/5 in upper and lower extremities, both proximally and distally." (R. 328). Dr. Vitorovic observed no involuntary movements. (*Id.*). Dr. Vitorovic ordered further tests for the spells, including a brain MRI and EEG. (R. 329).

### 4. Psychiatric Evaluation - Dr. Carly Mount, Psy.D.

In April 2016, Plaintiff went to Dr. Carly Mount, Psy.D., for a psychiatric evaluation. (R. 340–44). Plaintiff reported having difficulty with sleep and a varying appetite. (R. 340). Plaintiff also reported experiencing "dysphoric moods, occasional spells, guilt, hopelessness, loss of interest, irritability, and outbursts of anger," as well as "low energy, low self-esteem, and social withdrawal." (*Id.*). Plaintiff said that he had experienced anxiety since he was a child, and explained he had trouble concentrating and feelings of worry and restlessness. (R. 341). Plaintiff also reported short term memory problems and a diagnosis of ADHD. (*Id.*). He stated that "Tourette's is constantly on my mind." (*Id.*).

Dr. Mount noted that Plaintiff's thought process was "coherent and goal directed." (R. 342). Dr. Mount described Plaintiff's mood as "dysthymic and anxious" and his affect as "dysphoric, tearful, and anxious." (*Id.*). Plaintiff's attention and concentration were "intact," and he was "able to count, perform simple calculations, and [identify] serial 3s'." (*Id.*).

Plaintiff's recent and remote memory skills were also intact, he was able to recall three objects immediately and at delay, and he completed digits forward up to five and backward to three. (*Id*.). Dr. Mount described Plaintiff's intellectual functioning as "average," and his general fund of information as "appropriate to experience." (*Id*.). Dr. Mount described Plaintiff's insight as "fair to poor" and his judgement as "fair." (R. 342–43). Dr. Mount concluded that:

> [Plaintiff] is able to follow and understand simple directions and instructions. He is able to perform simple tasks independently. He has mild to moderate limitation maintaining attention and concentration. He has moderate limitation maintaining a regular schedule. He has moderate limitation learning new tasks and performing complex tasks independently, he has mild limitation making appropriate decisions. He has moderate limitation relating adequately with others and appropriately dealing with stress. Difficulties are caused by anxiety, depression, Tourette's syndrome, and cognitive issues.

(R. 343).

Dr. Mount assessed that Plaintiff's evaluation appeared to be consistent with psychiatric and cognitive problems, which "may significantly interfere with [his] ability to function on a daily basis." (*Id*.). Dr. Mount opined that Plaintiff's prognosis was "fair" and recommended individual psychological therapy. (R. 344).

### 5. Physical Examination - Dr. Nader Wassef, M.D.

In May 2016, Plaintiff was evaluated by Dr. Nader Wassef, M.D., for an internal medicine examination. (R. 350–54). Plaintiff's reported medications were Motrin, Tylenol, Prilosec, Glucosamine, Alka-Seltzer, and Pepto Bismol. (R. 351). Dr. Wassef noted that he could detect Plaintiff's head nodding, neck tilt, and shoulder shrugging. (R. 352). On exam, Plaintiff's strength was "5/5 in the upper and lower extremities," and his hand and finger dexterity were intact, with "grip strength 5/5 bilaterally." (R. 353). Plaintiff's cervical spine and lumbar spine showed "full flexion, extension, lateral flexion bilaterally, and full rotary

movement bilaterally." (*Id.*).  Dr. Wassef assessed that Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally. (*Id.*).  Plaintiff's joints were described as "stable and tender." (*Id.*).

Dr. Wassef diagnosed Plaintiff with Tourette's syndrome, generalized anxiety, social anxiety, panic disorder, sleep disorder, ADHD, neck pain, bilateral shoulder pain, pain in eye sockets, depression, anger issues, secondary dystonia, motion sickness, "effective dysfunction disorder," and "spells."  (R. 353–54).  Dr. Wassef concluded that:

> [Plaintiff] should not be driving cars or trucks.  He should not be operating heavy machines.  He should not be doing any type of high altitude activity, he should not be diving or swimming.  He has moderate limitations in regard to lifting, pushing, pulling, and handling.

(R. 354).  He opined that Plaintiff's prognosis was "fair."  (*Id.*).

### 6.   State Agency Consultant

In May 2016, a psychological consultant for the SSA, L. Hoffman, Ph.D., reviewed Plaintiff's medical evidence.  (R. 86–98).  Dr. Hoffman found that Plaintiff had three medically determinable impairments: organic brain syndrome, affective disorders, and anxiety disorders. (R. 90).  Dr. Hoffman assessed that Plaintiff could stand, walk, and/or sit for six hours in an eight hour day, but he had postural limitations such that he should avoid heights, machinery, and driving due to his Tourette's and seizure-like episodes.  (R. 93).  Dr. Hoffman assessed that Plaintiff was able to understand and carry out simple instructions, could maintain adequate attention and concentration to complete work like procedures, was limited in his ability to work with the public, exhibited some difficulty with adaptation but could cope with basic changes and make routine decisions.  (R. 96).

### C.  ALJ's Decision Denying Benefits

On November 7, 2018, ALJ Stoles issued a decision denying Plaintiff's claim for disability insurance benefits.  (R. 10–21).  At step one of the five-step evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity after his alleged onset date, September 1, 2011, through the date he was last insured, December 31, 2016.  (R. 12).

At step two, the ALJ found that under 20 C.F.R. § 404.1520(c), Plaintiff's "severe impairments" included Tourette's syndrome, cervical disorder, major depressive disorder, social anxiety, and panic disorder.  (*Id.*).  Further, these medically determinable impairments significantly limited Plaintiff's ability to perform basic work.  (*Id.*).

At step three, the ALJ found that, while severe, Plaintiff's impairments, independently or in combination, did not meet the requirements of any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§§  404.1520(d), 404.1525, and 404.1526).  (R. 13).  Before proceeding to step four, the ALJ found that:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1576(b) except: [Plaintiff] could occasionally climb ramps and stairs, never ladders, ropes, or scaffolds, he could not work at unprotected heights or use a motor vehicle for work purposes and he needed to avoid the use of heavy machinery.  He needed to avoid constant, repetitive twisting, turning, and nodding of the neck over the eight-hour workday.  He was limited to a low stress work environment defined as, simple routine, repetitive tasks, basic work related decisions, rare changes in the workplace setting, occasional interactions with the public, limited to superficial interactions, and frequent interaction with co-workers, and supervisors.

(R. 14).  The ALJ's supporting analysis explains that he reached this determination based primarily on the opinions of Drs. Mount, Hoffman, Wassef, and Boyd.  (R. 14–19).

At step four, the ALJ determined that Plaintiff was unable to perform any of his past relevant work because the demands exceeded his residual functional capacity ("RFC").  (R. 19).  Finally, at step five the ALJ found that Plaintiff could still perform jobs that existed in

significant numbers in the national economy.  (R. 20).  Specifically, based on Plaintiff's age, education, job skills, work experience, and RFC, plus testimony from the vocational expert, the ALJ found that Plaintiff would have been able to work as an "order caller" or a "photo machine operator."  (R. 20).  Therefore, the ALJ concluded that Plaintiff was "not disabled" under Sections 216(i) and 223(d) of the Social Security Act.  (R. 21).

## III.   LEGAL STANDARDS

### A.  Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d

145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920.  The Regulations define

residual functional capacity ("RFC") as "the most you can still do despite your limitations,"

including limitations on physical and mental abilities.  20 C.F.R. §§ 404.1545, 416.945.

In assessing the RFC of a claimant with multiple impairments, the Commissioner considers all

"medically determinable impairments, including . . . medically determinable impairments that

are not 'severe.'"  *Id.* §§ 404.1545(a)(2), 416.945(a)(2).  The claimant bears the initial burden of

establishing disability at the first four steps; the Commissioner bears the burden at the last.

*Selian*, 708 F.3d at 418.

### B.  Standard of Review

　　　In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does

not determine *de novo* whether Plaintiff is disabled.  Rather, the Court must review the

administrative record to determine whether "there is substantial evidence, considering the record

as a whole, to support the Commissioner's decision and if the correct legal standards have been

applied."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citation omitted).

　　　When evaluating the Commissioner's decision, "the reviewing court is required to

examine the entire record, including contradictory evidence and evidence from which conflicting

inferences can be drawn."  *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033,

1038 (2d Cir. 1983)).  The Court may set aside the final decision of the Commissioner only if it

is not supported by substantial evidence or if it is affected by legal error.  42 U.S.C. § 405(g);

*Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d

Cir. 2008).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).  However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018).  In other words, there must be substantial evidence to support a finding of functional limitations or lack thereof.

## IV.   DISCUSSION

### A.  Failure to Prosecute

Plaintiff brings this appeal *pro se* and has not filed a supporting brief, which was originally due on July 13, 2020.  On September 11, 2020, the Court ordered Plaintiff to file his brief or advise as to the status of such filing by October 14, 2020.  (Dkt. No. 12).  Plaintiff failed to do so, and the Court entered another Order on October 23, 2020 directing: Defendant to file a brief on behalf of the Commissioner by December 7, 2020, to file a proof of service on Plaintiff, and for Plaintiff to file a brief on or before January 21, 2021.  (Dkt. No. 14).  Plaintiff was also provided a copy of General Order 18 and warned that failure to file a brief would "result in the consideration of this appeal without the benefit of Plaintiff's arguments and may result in a decision heavily influenced by the Commissioner's version of the facts or may result in dismissal of the action for failure to prosecute and failure to follow Court orders."  (*Id*.).  Defendant then filed its brief and proof of service.  (Dkt. Nos. 17–18).  Finally, on January 21, 2021, Plaintiff filed a letter asking for a 90-day extension to submit his brief.  (Dkt. No. 19).  The Court granted

Plaintiff an extension until March 5, 2021.  (Dkt. No. 20).  Still, Plaintiff has not filed a brief,

despite the Court's repeated reminders, extensions, and warning.

Under these circumstances, the Court could dismiss Plaintiff's case for failure to

prosecute and failure to comply with Court orders.  However, in deference to Plaintiff's *pro se*

status and out of an abundance of caution, the Court has reviewed the entire administrative

record to determine whether the ALJ's decision is supported by substantial evidence.  *See*

*Deinna G. v. Saul*, No. 18-CV-1342, 2020 WL 613964, at *6, 2020 U.S. Dist. LEXIS 22320, at

*16 (N.D.N.Y. Feb. 10, 2020) (citing *Hubbard v. Comm'r of Soc. Sec.*, No. 14-CV-1401, 2016

WL 551783, at *4, 2016 U.S. Dist. LEXIS 17300, at *9 (N.D.N.Y. Jan. 14, 2016) ("The Court

will 'consider' the case notwithstanding a plaintiff's failure to file a brief, albeit in a way that

might be 'heavily influenced by the Commissioner's version of the facts.'")).

### B.  Analysis

To begin, the Commissioner argues that Plaintiff's appeal must fail for several reasons:

1) substantial evidence supports the ALJ's step-three determination; 2) substantial evidence

supports the ALJ's RFC determination; 3) the ALJ properly evaluated Plaintiff's symptoms; and

4) substantial evidence supports the ALJ's step-five determination.  (Dkt. No. 17).

### 1.  Step Three Determination

In general, the SSA has Listings for each major body system that describe "impairments

that [the SSA] consider[s] to be severe enough to prevent an individual from doing any gainful

activity, regardless of [a claimant's] age, education, or work experience."  20 C.F.R. §§

404.1525(a), 416.925(a).  To qualify for a Listing, a claimant must demonstrate that his

impairment(s) "meet[s] all of the specified medical criteria."  *Sullivan v. Zebley*, 493 U.S. 521,

530 (1990).  Therefore, "an impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id*.

The ALJ found that Plaintiff's impairments did not meet the requirements set forth in Listing 1.00 (musculoskeletal impairments) or Listing 12.00 (mental disorders).  (R. 13–14). Regarding mental impairments, the ALJ found that Plaintiff had "moderate difficulty understanding, remembering, or applying information; moderate difficulty interacting with others; moderate difficulty concentrating, persisting, or maintaining pace; and moderate difficulty adapting or managing himself."  (R. 13).  The ALJ found that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms; however, [his] reports concerning the intensity, persistence, and limiting effects of these symptoms . . . are not entirely consistent with the medical evidence and other evidence in the record."  (R. 15).  These findings were supported by "the very minimal, conservative nature of the claimant's mental health treatment history since the alleged disability onset date; his generally normal clinical findings on examinations; and the lack of any medical opinion evidence establishing a greater degree of limitation, through [Plaintiff's] date last insured."  (R. 13).

The ALJ also noted that Plaintiff's records established a history of various prescribed medications for anxiety and that when Plaintiff ceased treatment, he described his anxiety as "relatively stable, bothersome, but manageable."  (R. 15).  The record also did not document any outpatient treatment for difficulties related to Plaintiff's mental impairments through the date last insured.  In addition, the ALJ referred to Dr. Mount's opinion that Plaintiff had no limitations for following and understanding simple directions and instructions, and performing simple tasks independently; mild limitations making appropriate decisions; mild to moderate limitations maintaining attention and concentration, learning new tasks, and performing complex

tasks independently; and moderate limitations on maintaining a regular schedule, relating

adequately with others, and appropriately dealing with stress.  (*Id.*).  And the ALJ cited Dr.

Hoffman's assessment that Plaintiff "retained the ability to understand and remember simple and

detailed instructions and work procedures . . . and maintain adequate attention and concentration

to complete work like procedures and sustain a routine without substantial limitation."  (R. 16).

Regarding Plaintiff's physical impairments, the ALJ noted that Plaintiff drove to the

hearing, he drove short distances daily, and that he drove over three hours that summer to a

family camp in New Hampshire.  (R. 14).  Plaintiff also helped with light chores at home, such

as cooking, sweeping, and going to the grocery store.  (*Id.*).  The ALJ also noted that Plaintiff

often ceased the treatments prescribed to him due to side effects, but his clinical findings

remained stable.  (R. 18).  Further, the ALJ noted evidence from physical examinations that

"other than abnormal head and neck movement and neck tenderness with palpitation, objective

findings were essentially normal, including musculoskeletal, neurological, and psychiatric

findings," and Plaintiff's primary care records "document[ed] generally normal findings."  (*Id.*).

The ALJ also noted Dr. Wassef's assessment that Plaintiff had only moderate limitations for

lifting, pushing, pulling, and handling.  (*Id.*).  As to Plaintiff's Tourette's syndrome, the ALJ

stated that Plaintiff "has lived with this condition for most of his life, including [during] periods

of gainful employment."  (R. 19).

Based on this evidence, the ALJ determined that Plaintiff did not have the "marked" or

"extreme" limitation(s) required by paragraph B for Listings 1.00, 12.02, 12.04, or 12.06.  (R.

13).  The ALJ further stated that the evidence failed to establish the presence of paragraph C

criteria.  (*Id.*).  After careful review of the record, the Court finds that the ALJ's analysis is

supported by substantial evidence, including statements by Plaintiff's treating physician, Dr.

Boyd, who stated that that his tics were "suppressible" and "responsive" to pain relief, and by

Dr. Mount, who described his thought process as "coherent and goal directed," and stated that

his attention and concentration and memory skills were "intact," and that his cognitive

functioning was "average." (R. 323). The record does not contain substantial evidence that

Plaintiff's physical or mental impairments caused any "extreme" or "marked" limitations during

the relevant time period. Accordingly, the Court finds that there was substantial evidence to

support the ALJ's conclusion that Plaintiff did not meet or equal the impairment criteria for one

of the Listings.

### 2.   Residual Functional Capacity Determination

The ALJ determined that Plaintiff had the RFC to perform light work, except with the

following limitations: he could occasionally climb ramps and stairs, never ladders, ropes, or

scaffolds; he could not work at unprotected heights or use a motor vehicle for work purposes

and he needed to avoid the use of heavy machinery; he needed to avoid constant, repetitive

twisting, turning, and nodding of the neck over the eight-hour workday; he was limited to a low

stress work environment, with only simple, routine, repetitive tasks and occasional interaction

with the public. (R. 14). In support of this determination, the ALJ conducted an extensive

review and analysis of Plaintiff's medical record. (R. 14–19). As to Plaintiff's physical

impairments, the ALJ accorded some weight to the opinion of Dr. Wassef, who found that

Plaintiff "had full cervical and lumbar motion and full motion of the upper and lower

extremities," full strength in the upper and lower extremities, stable joints, and intact hand and

finger dexterity. (R. 18). Dr. Wassef found that Plaintiff had moderate limitations for lifting,

pushing, pulling, and handling. (*Id.*). The ALJ also cited Dr. Boyd's notes, which indicated that

Plaintiff's "objective findings were essentially normal," except for abnormal head and neck

movement and neck tenderness with palpitation.  (*Id.*).  And the ALJ noted that Plaintiff

continued to perform some activities of daily living.  (R. 19).

As to Plaintiff's mental impairments, the ALJ gave great weight to Dr. Mount's opinion

because it was "formed by a personal examination and was . . . generally consistent with the

totality of the evidence."  (R. 15).  Dr. Mount found that Plaintiff's thought process was

"coherent and goal directed," his attention and concentration were "intact," and his intellectual

functioning was "average."  (R. 341).  The ALJ noted that Plaintiff had "no significant history of

specialized mental health treatment," and that he only commenced outpatient mental health

treatment in 2018, well after his date last insured.  (R. 16, 19).  The ALJ also relied on the

opinion of Dr. Hoffman, who stated that "the claimant's [mental] impairments did not result in

greater than moderate limitations."  (R. 16).  Dr. Hoffman's opinion was accorded great weight,

as it was "supported by clinical findings and overall medical history" and "State agency . . .

consultants are highly qualified physicians and psychologists who are experts in the evaluation

of the medical issues in disability claims under the Act."  (*Id.*); *see also Baszto v. Astrue*, 700 F.

Supp. 2d 242, 249 (N.D.N.Y. 2010) ("an ALJ is entitled to rely upon the opinions of both

examining and nonexamining State agency medical consultants, since such consultants are

deemed to be qualified experts in the field of social security disability").

In formulating the RFC, the ALJ took into account Plaintiff's physical and mental

impairments—Tourette's, cervical disorder, major depressive disorder, social anxiety, and panic

disorder— by limiting him to light work where he could avoid: seizure-related risks of falling;

constant, repetitive twisting, turning, and nodding of the neck; and stressful, complex work with

the public.  Accordingly, upon careful review of the record, the Court finds that the ALJ's RFC

determination is supported by substantial evidence, including the assessments of Plaintiff's

doctors and the examining and non-examining consultants.  Although Plaintiff reported more

disabling limitations, the ALJ was permitted to discount his symptoms based on substantial

evidence to the contrary.[2]  *See Miller v. Colvin*, 85 F. Supp. 3d 742, 756–57 (W.D.N.Y. 2015)

(affirming the ALJ's decision to discount the plaintiff's subjective complaints based on

substantial evidence to the contrary); *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270–72

(N.D.N.Y. 2009) (same).

### 3.  Step Five Determination

At the last step, the ALJ determined that "considering [Plaintiff's] age, education, work

experience, and residual functional capacity, [he] was capable of making a successful adjustment

to other work that existed in significant numbers in the national economy."  (R. 21).  Therefore,

the ALJ concluded that Plaintiff was not disabled.  In making this determination, the ALJ relied

on the testimony of a vocational expert, who testified that there were occupations in the national

economy that someone in Plaintiff's position could perform, including "order caller," "office

helper," and "photocopying machine operator."  (R. 80).  The expert also testified that someone

in Plaintiff's position would be able to perform these jobs if he was limited to occasional

interaction to the public, required a stand/sit option at will, and would be off task five percent of

the eight hour workday.  (R. 80–82).  The ALJ's use of the expert's testimony was proper

because there was substantial evidence supporting the RFC, as discussed above.  Accordingly,

the Court finds no error in the ALJ's step five analysis and conclusion that Plaintiff was not

disabled during the relevant time period.

---

[2] The Court also finds that the ALJ did not err in evaluating Plaintiff's symptoms, for the reasons explained in the Commissioner's brief.  (Dkt. No. 17, pp. 15–18).

### 4.  Additional Evidence

Before closing, the Court notes that Plaintiff's letter for an extension appears to reference new evidence from his treating physician Dr. Boyd that was not considered at his hearing "due to a technicality." (Dkt. No. 19).  Because Plaintiff has not filed a brief in this matter, it is not clear exactly what he is referring to.  But the record shows that Plaintiff submitted to the ALJ medical records related to treatment with Dr. Boyd in 2018.  (R. 400–30).  The ALJ stated that because this evidence was dated after the relevant time period (approximately 2011 to 2016), "evaluation of the evidence is unnecessary and the opinions are not entitled to weight through that period."  (R. 22).  The ALJ further stated that although Dr. Boyd provided an opinion dated May 2018, that opinion was not indicative of Plaintiff's RFC during the relevant time period. (R. 22).  After the ALJ's decision, Plaintiff submitted to the Appeals Council another opinion from Dr. Boyd, this one dated February 18, 2019.  (R. 2).  Dr. Boyd stated that "due to the medically refractory nature of [Plaintiff's] dystonic cervical tic and associated moderate to severe continuous pain, he has had marked impairment daily function and has been incompatible with gainful employment."  (R. 85).  Dr. Boyd also stated that Plaintiff's "persistent anxiety with obsessive-compulsive disorder . . . exacerbated his tics but additionally produce their own level of disability."  (R. 85).  The Appeals Council found that this evidence did "not show a reasonable probability that it would change the outcome of the decision."  (R. 2).

The Court has reviewed the above records and agrees with the analysis of the ALJ and Appeals Council.  Notably, the ALJ discussed the *contemporaneous* assessments and findings of Dr. Boyd, whereas the 2018 and 2019 records came well after the relevant time period. Therefore, the Court finds that these records do not alter the conclusion that the ALJ's decision is supported by substantial evidence.  *See also Behling v. Comm'r of Soc. Sec.*, 369 F. App'x

292, 294 (2d Cir. 2010) (Summary Order) (finding that the claimant's current condition was not relevant because she "was required to demonstrate that she was disabled as of the date on which she was last insured" and "[a]ny new impairments are not relevant") (citation omitted); *Flanigan v. Colvin*, 21 F. Supp. 3d 285, 302 (S.D.N.Y. 2014) (denying benefits where "at best the evidence show[ed] that [claimant] experienced progressively worsening symptoms that eventually became disabling" after his date last insured).!

Finally, if Plaintiff's condition has worsened since the denial of his application for disability benefits, he may of course reapply with new medical evidence.  *Ryles v. Sec. of Health and Human Services*, 526 F. Supp. 1141, 1143 (E.D.N.Y. 1981) ("if a claimant's physical condition should deteriorate after a claim has been denied, the proper procedure is to reapply for disability benefits based upon the facts as they then exist").

## V.    CONCLUSION

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision is supported by substantial evidence.  Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder."  *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).  After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date: March 18, 2021
        Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge